COMMONWEALTH *vs.* ABRAHAM A. ISENSTADT.

Middlesex.     May 7, 1945. — September 17, 1945.

Present: FIELD, C.J., LUMMUS, QUA, RONAN, & WILKINS, JJ.

*Obscene, Indecent or Impure Publication.  Constitutional Law,* Police power.  *Evidence,* Opinion: expert; Relevancy and materiality; Judicial notice.  *Pleading, Criminal,* Complaint.

A conviction upon a complaint under G. L. (Ter. Ed.) c. 272, § 28, as in force in 1944, charging the defendant with selling and having in his possession for the purpose of sale, exhibition, loan, or circulation a certain book which was "obscene, indecent, or impure, or manifestly tends to corrupt the morals of youth," was warranted, where the defendant raised no question as to the disjunctive form of the complaint, if any one of the several offences disjunctively set forth

was found to have been committed, so far as such offences were susceptible of differentiation.

A finding beyond a reasonable doubt that a certain book of fiction, intended for general sale, was obscene, indecent, or impure, or manifestly tended to corrupt the morals of youth, in violation, in 1944, of G. L. (Ter. Ed.) c. 272, § 28, in its then form, was warranted within the principles that, to come within the statute, the book must contain prohibited matter in such quantity or of such nature as to flavor the whole and impart to the whole any of the qualities stated in the statute so that the book as a whole could fairly be described by any of the adjectives or descriptive expressions contained in the statute; that the test of unlawfulness was to be found in the book's effect upon its probable readers and not in any classification of its subject matter or of its words as being in themselves innocent or obscene; that the statute was not intended to set up any standard merely of taste but dealt with matters of sex and sexual desire; that the book must be judged in the light of the customs and habits of thought of the time and place of the alleged offence; that the probable "audience" of the book must be taken into account; that the statute was intended for the protection of the public as a whole, without segregating either the most susceptible or the least susceptible, and to apply to a book which adversely affected a substantial proportion of its readers; and that the book was not removed from the operation of the statute merely because it was a work of sincerity and art or a work in which those elements predominated. LUMMUS, J., agreeing with the construction of the statute by the court, dissented only from the conclusion that the evidence warranted the finding of guilty.

A book, obviously intended for general sale, having a substantial tendency to deprave or corrupt substantial numbers of that public into whose hands it was likely to fall by inciting lascivious thoughts or arousing lustful desire, was "obscene, indecent or impure" within the prohibition of G. L. (Ter. Ed.) c. 272, § 28, as in force in 1944.

Proof merely that a book tended to coarsen or vulgarize youth did not necessarily prove that it "manifestly tends to corrupt the morals of youth" within the prohibition of G. L. (Ter. Ed.) c. 272, § 28, as in force in 1944.

A conviction, based upon a warranted finding of violations in 1944 of G. L. (Ter. Ed.) c. 272, § 28, in its then form, was not in contravention of the Fourteenth Amendment to the Constitution of the United States; the statute was within the police power of the Commonwealth.

At the trial of complaints charging the defendant with selling a certain book of fiction and having it in his possession for the purpose of sale, exhibition, loan, or circulation, in 1944, in violation of G. L. (Ter. Ed.) c. 272, § 28, in its then form, testimony offered as opinions of experts, that the book was sincerely written; that it would elevate rather than corrupt morals; that it would not create lustful or lecherous desires in anyone; and that it was "perfectly consistent with the regular flow of literature now publicly sold in the Commonwealth," properly was excluded; the probable effect of the book upon the general public who might read it was not a proper subject of testimony by experts.

Evidence, that there were sold daily without prosecution books containing material more likely to corrupt the morals of youth than a book which was the subject of a complaint under G. L. (Ter. Ed.) c. 272, § 28, as in force in 1944, properly was excluded at the trial of such complaint.

At the trial of a complaint charging the defendant with selling and having in his possession for the purpose of sale, exhibition, loan, or circulation, in 1944, in violation of G. L. (Ter. Ed.) c. 272, § 28, in its then form, a certain book which was "obscene, indecent, and impure, or manifestly tends to corrupt the morals of youth," a request for a ruling making the effect of the book upon youth the sole test of applicability of the statute properly was refused.

At the trial of a complaint charging the defendant with selling a certain book of fiction and having it in his possession for the purpose of sale, exhibition, loan, or circulation, in 1944, in violation of G. L. (Ter. Ed.) c. 272, § 28, in its then form, a request for a ruling that, in determining guilt, the judge "should take into consideration the attitude of the community in accepting or rejecting the book," properly was refused in the absence of evidence of what was such "attitude"; the judge could not be required to take judicial notice thereof.

Two COMPLAINTS, received and sworn to in the Third District Court of Eastern Middlesex on April 26, 1944.

On appeal to the Superior Court, and upon waiver by the defendant of a trial by jury, the complaints were heard together by *Hanify*, J.

At the request of the defendant, the trial judge granted the following rulings: "13. As a matter of law, unless the entire book, Strange Fruit, judged as a whole is obscene, indecent or impure, or manifestly tends to corrupt the morals of youth, then the sale or possession for sale of Strange Fruit is not within the provisions of G. L. (Ter. Ed.) c. 272, § 28, as amended." "17. As a matter of law in determining whether the defendant is guilty of violating the provisions of G. L. (Ter. Ed.) c. 272, § 28, as amended, the court should take into consideration the present-day standards and conventions of the community as to interpreting or defining what is obscene, indecent, impure or manifestly tends to corrupt the morals of the youth."

The trial judge refused requests by the defendant for rulings as matters of law (3) that the book, Strange Fruit, was "not obscene"; (4) that it was not "indecent"; (5) that it was not "impure"; (6) that it did not "manifestly

tend to corrupt the morals of the youth"; (7) that its distribution among the public did "not create a clear and present danger to the public morals or safety"; and (8) that, if it did not do so, to apply the statute to the book would be unconstitutional in that it would unreasonably infringe upon the freedom of the press, and (9) "would deprive the defendant of his property and liberty," contrary, to the Fourteenth Amendment to the Federal Constitution, and (10) would amount to an unreasonable discriminatory application of the statute in violation of said Amendment; (11) that the statute is "invalid and void" because "vague, indefinite, uncertain and ambiguous," in violation of said Amendment; (12) that any finding by the court "that certain words, passages, or chapters are obscene, indecent, or impure, or manifestly tend to corrupt the morals of the youth" did "not permit the finding that the book as a whole is obscene, indecent or impure or manifestly tends to corrupt the morals of youth within the meaning of the provisions of" the statute; and also the following requests: "14. As a matter of law the defendant cannot be found to be guilty . . . unless it is found that the manifest tendency of the book as a whole is either to lower the standards of right and wrong among the youth concerning sexual behavior or to encourage among youths unlawful indulgences or lust, or to incite among youth immorality relating to sexual impurity"; and "16. As a matter of law in determining whether the defendant is guilty . . . the court should take into consideration the attitude of the community in accepting or rejecting the book"; and "18. If the court finds that the book . . . is a serious novel, honest and sincere in its delineation, then the defendant is not guilty"; and "19. The test which must be applied in determining guilt or innocence is the entire book's dominating effect, and, in applying the test, the relevancy of the objectionable parts to the theme and the established reputation of the work in the estimation of approved critics are persuasive pieces of evidence."

The defendant was found guilty on both complaints, and alleged exceptions.

*A. O. Dawson* of New York & *A. A. Albert*, (*J. N. Welch* with them,) for the defendant.

*G. E. Thompson*, District Attorney, & *A. DiCicco, Jr.*, Assistant District Attorney, for the Commonwealth, submitted a brief.

*H. Williams*, by leave of court, submitted a brief as amicus curiae.

QUA, J. The defendant has been found guilty by a judge of the Superior Court sitting without jury upon two complaints charging him respectively with selling and with having in his possession for the purpose of sale, exhibition, loan, or circulation a book published under the title "Strange Fruit," which is "obscene, indecent or impure, or manifestly tends to corrupt the morals of youth." G. L. (Ter. Ed.) c. 272, § 28, as amended by St. 1934, c. 231, and St. 1943, c. 239. The section (except the part describing the penalty) is reproduced in the footnote.[1]

The complaints are in disjunctive form, but this point was not taken. The defendant could therefore be convicted if he committed any one of the several offences set forth in so far as such offences are susceptible of differentiation. G. L. (Ter. Ed.) c. 278, § 17. *Commonwealth* v. *McKnight*, 283 Mass. 35, 38–39. *Commonwealth* v. *McMenimon*, 295 Mass. 467, 470–471.

We do not pretend ignorance of the controversy which has been carried on in this Commonwealth, sometimes with

---

[1] "Whoever imports, prints, publishes, sells or distributes a book, pamphlet, ballad, printed paper, phonographic record or other thing which is obscene, indecent or impure, or manifestly tends to corrupt the morals of youth, or an obscene, indecent or impure print, picture, figure, image or description, manifestly tending to corrupt the morals of youth, or introduces into a family, school or place of education, or buys, procures, receives or has in his possession any such book, pamphlet, ballad, printed paper, phonographic record, obscene, indecent or impure print, picture, figure, image or other thing, either for the purpose of sale, exhibition, loan or circulation or with intent to introduce the same into a family, school or place of education, shall . . . be punished . . . ." The germ of this statute is to be found in Prov. St. 1711–12, c. 6, § 19, 1 Prov. Laws, 682. It assumed a form approximating its present form in Rev. Sts. c. 130, § 10. Changes introduced by St. 1862, c. 168, § 1, St. 1880, c. 97, Pub. Sts. c. 207, § 15, St. 1890, c. 70, St. 1894, c. 433, R. L. c. 212, § 20, St. 1904, c. 120, § 1, St. 1913, c. 259, St. 1934, c. 231, and St. 1943, c. 239, require no comment in this case. Reference will be made later to St. 1930, c. 162, and to St. 1945, c. 278. The statute last mentioned adds an entirely new procedure.

vehemence, over so called "literary censorship."[1]    With
this background in mind it may not be out of place to recall
that it is not our function to assume a "liberal" attitude
or a "conservative" attitude.  As in other cases of statutory
construction and application, it is our plain but not neces-
sarily easy duty to read the words of the statute in the sense
in which they were intended, to accept and enforce the pub-
lic policy of the Commonwealth as disclosed by its policy-
making body, whatever our own personal opinions may be,
and to avoid judicial legislation in the guise of new con-
structions to meet real or supposed new popular viewpoints,
preserving always to the Legislature alone its proper prerog-
ative of adjusting the statutes to changed conditions.

We are fully aware of the uselessness of all interpretations
of the crucial words of this statute which merely define
each of those words by means of the others or of still other
words of practically the same signification.  We do not now
attempt by any single formula to furnish a test for all types
of publications, including scientific and medical treatises,
religious and educational works, newspapers and periodi-
cals, and classical and recent literature, as well as phono-
graph records, prints, pictures, paintings, images, statuary
and sculpture, artistic or otherwise, all of which are within
the literal words of the statute and might conceivably fall
within its prohibitions.  In this case we are dealing with a
recent work of fiction — a novel.  We shall, in general,
confine our observations to the case in hand, without neces-
sarily binding ourselves to apply all that is here said to
entirely different forms of writing or to representations by
picture or image.

We deal first with a number of pertinent propositions
advanced in the able briefs filed in behalf of the defendant.
We agree with some of them.

(1) We agree that since the amendment of the section as
it appeared in the General Laws by St. 1930, c. 162, the
book is to be treated as a whole in determining whether it

---

[1] See "Massachusetts and Censorship," by S. S. Grant and S. E. Angoff,
10 Boston Univ. L. Rev. 147;  "Judicial Censorship of Obscene Literature,"
by L. M. Alpert, 52 Harv. L. Rev. 40.

violates the statute.[1]  It is not to be condemned merely because it may contain somewhere between its covers some expressions which, taken by themselves alone, might be obnoxious to the statute. *Halsey* v. *New York Society for the Suppression of Vice*, 234 N. Y. 1, 4.  *United States* v. *One Book Entitled Ulysses*, 72 Fed. (2d) 705, 707.  *United States* v. *Levine*, 83 Fed. (2d) 156.  But this does not mean that every page of the book must be of the character described in the statute before the statute can apply to the book.  It could never have been intended that obscene matter should escape proscription simply by joining to itself some innocent matter.  A reasonable construction can be attained only by saying that the book is within the statute if it contains prohibited matter in such quantity or of such nature as to flavor the whole and impart to the whole any of the qualities mentioned in the statute, so that the book as a whole can fairly be described by any of the adjectives or descriptive expressions contained in the statute.  The problem is to be solved, not by counting pages, but rather by considering the impressions likely to be created.  For example, a book might be found to come within the prohibition of the statute although only a comparatively few passages contained matter objectionable according to the principles herein explained if that matter were such as to offer a strong salacious appeal and to cause the book to be bought and read on account of it.

(2) We agree with the weight of authority that under each of the prohibitions contained in the statute the test of unlawfulness is to be found in the effect of the book upon its probable readers and not in any classification of its subject matter or of its words as being in themselves innocent or obscene.[2]  A book is "obscene, indecent or impure"

---

[1] Before this amendment the section read, "Whoever . . . sells . . . a book . . . *containing obscene, indecent or impure language,* or manifestly tending to corrupt the morals of youth . . . ."  After the amendment it read, "Whoever . . . sells . . . a book . . . *which is obscene, indecent or impure,* or manifestly tends to corrupt the morals of youth . . . ." (Italics ours.)  See *Commonwealth* v. *Friede*, 271 Mass. 318, 321–322.

[2] *The Queen* v. *Hicklin*, L. R. 3 Q. B. 360, 371.  *Commonwealth* v. *Allison*, 227 Mass. 57, 61.  *Commonwealth* v. *Friede*, 271 Mass. 318, 321.  *Rosen* v. *United States*, 161 U. S. 29, 43.  *Dunlop* v. *United States*, 165 U. S. 486, 500. *Dysart* v. *United States*, 272 U. S. 655.  *United States* v. *Bennett*, 16 Blatchf.

within the statutory prohibition if it has a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire. It also violates the statute if it "manifestly tends to corrupt the morals of youth." The latter prohibition is expressly limited to the kind of effect specified — the corruption of morals. Under this branch of the statute it is not enough that a book may tend to coarsen or vulgarize youth if it does not manifestly tend to corrupt the morals of youth. *People* v. *Wendling*, 258 N. Y. 451, 453.

Although in their broadest meaning the statutory words "obscene, indecent or impure" might signify offensive to refinement, propriety and good taste, we are convinced that the Legislature did not intend by those words to set up any standard merely of taste, even if under the Constitution it could do so. Taste depends upon convention, and sometimes upon irrational taboo. It varies "with the period, the place, and the training, environment and characteristics of persons." *Reddington* v. *Reddington*, 317 Mass. 760, 765. A penal statute requiring conformity to some current standard of propriety defined only by the statutory words quoted above would make the standard an uncertain one, shifting with every new judge or jury. It would be like a statute penalizing a citizen for failing to act in every situation in a gentlemanly manner. Such a statute would be unworkable if not unconstitutional, for in effect it would "license . . . the jury to create its own standard in each case," ex post facto. *Herndon* v. *Lowry*, 301 U. S. 242, 263. Such a test must be rejected. The prohibitions of the statute are concerned with sex and sexual desire. The statute does not forbid realistically coarse scenes or vulgar words merely because they are coarse or vulgar, although such scenes or words may be considered so far as they bear upon the test already stated of the effect of the book upon its readers.

C. C. 338, 364–366. *United States* v. *Males,* 51 Fed. 41. *Knowles* v. *United States,* 170 Fed. 409, 412. *United States* v. *Kennerley,* 209 Fed. 119. *Griffin* v. *United States,* 248 Fed. 6, 8–9. *Krause* v. *United States,* 29 Fed. (2d) 248, 250. *United States* v. *Dennett,* 39 Fed. (2d) 564, 568. *Duncan* v. *United States,* 48 Fed. (2d) 128, 132. *People* v. *Brainard,* 192 App. Div. (N. Y.) 816, 820–821. See also *People* v. *Wendling,* 258 N. Y. 451, 81 Am. L. R. 799.

(3) Since effect is the test, it follows that a book is to be judged in the light of the customs and habits of thought of the time and place of the alleged offence. Although the fundamentals of human nature change but slowly, if indeed they change at all, customs and habits of thought do vary with time and place. That which may give rise to impure thought and action in a highly conventional society may pass almost unnoticed in a society habituated to greater freedom. *United States* v. *Kennerley,* 209 Fed. 119, 121. *Parmelee* v. *United States,* 113 Fed. (2d) 729, 731–732. To recognize this is not to change the law. It is merely to acknowledge the facts upon which the application of the law has always depended. And of the operation of this principle it would seem that a jury of the time and place, representing a cross section of the people, both old and young, should commonly be a suitable arbiter. *United States* v. *Clarke,* 38 Fed. 500. *United States* v. *Kennerley,* 209 Fed. 119, 121.

(4) So, too, we think it proper to take into account what we may call the probable "audience" of the book, just as the effect of a lecture might depend in large degree upon the character of those to whom it is addressed. At one extreme may be placed a highly technical medical work, sold at a great price and advertised only among physicians. At the other extreme may be placed a rather well known type of the grossest pornography obviously prepared for persons of low standards and generally intended for juvenile consumption and distributed where it is most likely to reach juvenile eyes. Most questioned books will fall between these extremes. Moreover, the statute was designed for the protection of the public as a whole. Putting aside for the moment the reference in the statute itself to that which manifestly tends to corrupt the morals of youth, a book placed in general circulation is not to be condemned merely because it might have an unfortunate effect upon some few members of the community who might be peculiarly susceptible. The statute is to be construed reasonably. The fundamental right of the public to read is not to be trimmed down to the point where a few prurient persons can find

nothing upon which their hypersensitive imaginations may dwell. *United States* v. *Kennerley*, 209 Fed. 119, 120. The thing to be considered is whether the book will be appreciably injurious to society in the respects previously stated because of its effect upon those who read it, without segregating either the most susceptible or the least susceptible, remembering that many persons who form part of the reading public and who cannot be called abnormal are highly susceptible to influences of the kind in question and that most persons are susceptible to some degree, and without forgetting youth as an important part of the mass, if the book is likely to be read by youth. *United States* v. *Harmon*, 45 Fed. 414, 417. *United States* v. *Levine*, 83 Fed. (2d) 156.¹ *Parmelee* v. *United States*, 113 Fed. (2d) 729, 731. The jury must ask themselves whether the book will in some appreciable measure do the harm the Legislature intended to prevent. This is not a matter of mathematics. The answer cannot be found by saying, for example, that only about one third of probable readers would be adversely affected and then classifying that one third as "abnormal" and concluding that as the book does not adversely affect "normal" persons it is not within the statute. A book that adversely affects a substantial proportion of its readers may well be found to lower appreciably the average moral tone of the mass in the respects hereinbefore described and to fall within the intended prohibition.¹ It seems to us that the statute cannot be construed as meaning less than this without impairing its capacity to give the protection to society which the Legislature intended it should give.

(5) We cannot accept the proposition which seems to have been accorded hospitality in a few of the more recent cases in another jurisdiction and which perhaps has been

---

¹ It is for this reason, if not for others, that we think it was not error to deny the defendant's fifteenth request for ruling, which reads, "As a matter of law the defendant cannot be found to be guilty of violating the provisions of General Laws (Ter. Ed.) Chap. 272, sec. 28 as amended, unless it is found that the manifest tendency of the book is to corrupt the morals of the normal youth or adult as compared to the abnormal." This request seeks to classify rigidly all persons with respect to susceptibility as "normal" or "abnormal" and overlooks the possible harmful effect upon a substantial proportion of readers who may be less than a majority and therefore overlooks the possible harm to the mass.

suggested rather than argued in the present case, to wit, that even a work of fiction, taken as a whole, cannot be obscene, indecent or impure if it is written with a sincere and lawful purpose and possesses artistic merit, and if sincerity and artistry are more prominent features of the book than obscenity.[1]  In dealing with such a practical matter as the enforcement of the statute here involved there is no room for the pleasing fancy that sincerity and art necessarily dispel obscenity.  The purpose of the statute is to protect the public from that which is harmful.  The public must be taken as it is.  The mass of the public may have no very serious interest in that which has motivated the author, and it can seldom be said that the great majority of the people will be so rapt in admiration of the artistry of a work as to overlook its salacious appeal.  Sincerity and literary art are not the antitheses of obscenity, indecency, and impurity in such manner that one set of qualities can be set off against the other and judgment rendered according to an imaginary balance supposed to be left over on one side or the other.  The same book may be characterized by all of these qualities.  Indeed, obscenity may sometimes be made even more alluring and suggestive by the zeal which comes from sincerity and by the added force of artistic presentation.  We are not sure that it would be impossible to produce even a serious treatise on gynecology in such a manner as to make it obscene.  Certainly a novel can be so written, even though the thoughtful reader can also find in it a serious message.  Sincerity and art can flourish without pornography, and seldom, if ever, will obscenity be needed to carry the lesson.  See *United States* v. *Kennerley*, 209 Fed. 119, 120–121; *United States* v. *Dennett*, 39 Fed. (2d) 564, 569.  The statute contains no exception of works of sincerity and art, or of works in which those elements predominate, if the proscribed elements are also present in such manner and degree as to remain characteristic of the book as a whole.  If it is thought that modern conditions

---

[1] See *United States* v. *One Book Entitled Ulysses,* 72 Fed. (2d) 705, 707–708;  *United States* v. *Levine,* 83 Fed. (2d) 156, 158;  *Parmelee* v. *United States,* 113 Fed. (2d) 729, 736.

require that such an exception be made, the Legislature and not this court should make it. This subject was the principal point of the decision in *Commonwealth* v. *Buckley*, 200 Mass. 346, where apt illustration is used. We adhere to the reasoning of that case. See further, *Commonwealth* v. *Friede*, 271 Mass. 318, 322–323; *Halsey* v. *New York Society for the Suppression of Vice*, 234 N. Y. 1, 6; and *People* v. *Pesky*, 230 App. Div. (N. Y.) 200 (citing *Commonwealth* v. *Buckley*, *supra*).

In taking this position, to which we believe ourselves compelled by the words of the statute, the necessity of enforcing it to accomplish its purposes, and our own previous construction of it, we do not go so far as to say that sincerity of purpose and literary merit are to be entirely ignored. These elements may be considered in so far as they bear upon the question whether the book, considered as a whole, is or is not obscene, indecent, or impure. It is possible that, even in the mind of the general reader, overpowering sincerity and beauty may sometimes entirely obscure or efface the evil effect of occasional questionable passages, especially with respect to the classics of literature that have gained recognized place as part of the great heritage of humanity. The question will commonly be one of fact in each case, and if, looking at the book as a whole, the bad is found to persist in substantial degree alongside the good, as the law now stands, the book will fall within the statute.

A brief description of the book "Strange Fruit" now seems necessary. The scene is laid in a small town in Georgia. A white boy, Tracy Deen, who lacks the forcefulness to get ahead in the world, and an educated but compliant colored girl, Nonnie Anderson, fall genuinely in love, but because of race inhibitions and pressures they cannot marry. Nonnie supplies to Tracy the sympathy and the nourishment of his self-esteem which his other associations deny him. Illicit intercourse occurs, resulting in pregnancy. Tragedy follows in the form of the murder of Tracy committed by Nonnie's outraged brother and the lynching of an innocent colored man for that crime. Distributed through this book (consisting of two hundred fifty pages in the edi-

tion submitted with the record) are four scenes of sexual intercourse, including one supposed to have been imagined. The immediate approaches to these acts and the descriptions of the acts themselves vary in length from a few lines to several pages. They differ in the degree of their suggestiveness. Two of them might be thought highly emotional, with strongly erotic connotations. In addition to these there is a fifth scene in an old abandoned cabin in which there are amatory attitudes, kissing, a loosened blouse, exposed breasts, and circumstances suggesting but perhaps not necessarily requiring an act of intercourse. In still another scene Tracy in a confused drunken frenzy "saw somebody" (himself) tear off Nonnie's clothes "until there was nothing between his hands and her body," "press her down against the floor," "press her body hard — saw him try and fail, try and fail, try and fail," but he "couldn't." In addition to the scenes just mentioned there are distributed fairly evenly throughout the book approximately fifty instances where the author introduces into the story such episodes as indecent assaults upon little girls, an instance of, and a soliloquy upon, masturbation by boys, and references to acts of excretion, to "bobbing" or "pointed" breasts, to "nice little rumps, hard . . . light, bouncy . . .," to a group of little girls "giggling mightily" upon discovering a boy behind a bush and looking at his "bared genitals." We need not recite more of these. The instances mentioned will indicate the general character of the others. Some of these minor incidents might be dismissed as of little or no consequence if there were fewer of them, but when they occur on an average on every fifth page from beginning to end of the book it would seem that a jury or a judge performing the function of a jury might find that they had a strong tendency to maintain a salacious interest in the reader's mind and to whet his appetite for the next major episode.

The principal question in the case is whether, consistently with the principles hereinbefore stated, we can say as matter of law that an honest jury, or an honest trial judge taking the place of a jury with the consent of the defendant, as in

this case, would not be acting as reasonable men in concluding beyond a reasonable doubt that this book, taken as a whole, possesses the qualities of obscenity, indecency, or impurity. The test is not what we ourselves think of the book, but what in our best judgment a trier of the facts might think of it without going beyond the bounds of honesty and reason. This distinction, difficult for laymen to grasp, is familiar enough to all lawyers. It is constantly applied by appellate courts and must be preserved if jury trial is to be preserved.

It is urged that this book was written with a serious purpose; that its theme is a legitimate one; that it possesses great literary merit; and that it has met with a generally favorable reception by reviewers and the reading public. We agree that it is a serious work. It brings out in bold relief the depth and the complexity of the race problem in the South, although, so far as we can see, it offers no remedy. We agree that the theme of a love which because of social conditions and conventions cannot be sanctioned by marriage and which leads to illicit relations is a permissible theme. That such a theme can be handled with power and realism without obscenity seems sufficiently demonstrated in George Eliot's "Adam Bede," which we believe is universally recognized as an English classic. We assume that the book before us is a work of literary merit. We are also prepared to assume for the purposes of this opinion that it has been favorably received by reviewers generally and widely sold to the public, although we do not find it necessary to decide whether the opinions of reviewers and the extent of sale are such well known facts that we ought to take judicial notice of them, if the result of the case depended upon our doing so. We hold, however, that the matters mentioned in this paragraph are not decisive of the issue before us.

Regarding the book as a whole, it is our opinion that a jury of honest and reasonable men could find beyond a reasonable doubt that it contains much that, even in this post-Victorian era, would tend to promote lascivious thoughts and to arouse lustful desire in the minds of substantial numbers of that public into whose hands this book,

obviously intended for general sale, is likely to fall; that the matter which could be found objectionable is not necessary to convey any sincere message the book may contain and is of such character and so pervades the work as to give to the whole a sensual and licentious quality calculated to produce the harm which the statute was intended to prevent; and that that quality could be found to persist notwithstanding any literary or artistic merit. We are therefore of opinion that the book could be found to be obscene, indecent, and impure within the meaning of the statute. We think that not only the legislators of 1835 who inserted the substance of the present wording in the statute but also the legislators of later years down to 1943 who amended the statute without greatly altering its substance would be surprised to learn that this court had held that a jury or a judge trying the facts could not even consider whether a book which answers the description already given of "Strange Fruit" falls within the statute.

For the same reasons we are of opinion that an honest and reasonable judge or jury could find beyond a reasonable doubt that this book "manifestly tends to corrupt the morals of youth." The statute does not make fitness for juvenile reading the test for all literature regardless of its object and of the manner of its distribution. Yet it cannot be supposed that the Legislature intended to give youth less protection than that given to the community as a whole by the general proscription of that which is "obscene, indecent or impure." Rather it would seem that something in the nature of additional protection of youth was intended by proscribing anything that manifestly tends to corrupt the morals of youth, even though it may not be obscene, indecent, or impure in the more general sense. At any rate, we think that almost any novel that is obscene, indecent or impure in the general sense also "manifestly tends to corrupt the morals of youth," if it is likely to fall into the hands of youth. The judge could find that the book in question would be read by many youths. Many adolescents are avid readers of novels.

It is contended that the conviction of the defendant vio-

lates the Fourteenth Amendment to the Constitution of the United States. See *Near* v. *Minnesota*, 283 U. S. 697, 707; *De Jonge* v. *Oregon*, 299 U. S. 353, 364. If, however, we are right in holding that an honest and reasonable jury could have found the defendant guilty, it seems to us that no substantial constitutional question remains. The State must have power to protect its citizens, and especially its youth, against obscenity in its various forms, including that which is written or printed. Statutes to this end have long existed. The distribution of obscene printed matter was a crime at common law. *Commonwealth* v. *Holmes*, 17 Mass. 336. Our own statute was held constitutional in *Commonwealth* v. *Allison*, 227 Mass. 57, 62, where this court said, "The subject matter is well within one of the most obvious and necessary branches of the police power of the State." *State* v. *McKee*, 73 Conn. 18. In *Near* v. *Minnesota*, 283 U. S. 697, at page 716, Chief Justice Hughes, after asserting the right of government in time of war to prevent the publication of the sailing dates of transports or of the number and location of troops, added this, "On similar grounds, the primary requirements of decency may be enforced against obscene publications." See *Gitlow* v. *New York*, 268 U. S. 652, 667; *Fox* v. *Washington*, 236 U. S. 273. And in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, at pages 571, 572, the court said that the use of certain well defined and narrowly limited classes of speech, including "the lewd and obscene" may be prevented and punished. If the so called "clear and present danger" doctrine enunciated in such cases as *Schenck* v. *United States*, 249 U. S. 47, 52, *Herndon* v. *Lowry*, 301 U. S. 242, *Bridges* v. *California*, 314 U. S. 252, and *Thomas* v. *Collins*, 323 U. S. 516, applies to cases like the present, it would seem that danger of corruption of the public mind is a sufficient danger, and that actual publication and sale render that danger sufficiently imminent to satisfy the doctrine.

The defendant complains of the exclusion of testimony offered by him through three witnesses — a writer and teacher of literature, a child psychiatrist, and a professor of theology who was the editor of "Zion's Herald" and who

had also been pastor of a church, had taught in a junior college and had been director of a boys' camp — tending to show as matter of expert opinion that the book was sincerely written; that it would elevate rather than corrupt morals; that it would not create lustful or lecherous desires in any one; that it is "perfectly consistent with the regular flow of literature now publicly sold in the Commonwealth . . ."; and that books containing material more likely to corrupt the morals of youth are sold daily without prosecution.

We cannot regard this exclusion as error. The principal matter about which expert opinion was sought was nothing more than the reaction of normal human beings to a kind of stimulation which is well within the experience of all mankind. Since the inquiry relates to the probable effect upon the general public who may read the book, there is reason to believe that a jury, being composed of men drawn from the various segments of that public, would be as good a judge of the effect as experts in literature or psychiatry, whose points of view and mental reactions in such matters are likely to be entirely different from those of the general public. If expert testimony is to be admitted in this instance it is difficult to see why it would not likewise be competent in a vast number of civil and criminal cases where issues of fact depend upon the emotions and reactions of normal persons in the conditions to which they are exposed. If such evidence becomes competent it will follow that an immense number of cases now submitted without hesitation to the good sense of juries and of trial judges performing the functions of juries cannot be adequately tried without an expensive array of experts on both sides. Experience in those fields in which expert testimony is now admittedly necessary does not lead us to look with favor upon such a sweeping extension. Without prejudging the indefinite future, we are not convinced that the time has come for it. In this we agree with *People* v. *Muller,* 96 N. Y. 408, and *St. Hubert Guild* v. *Quinn,* 64 Misc. (N. Y.) 336, 341–342. See *Commonwealth* v. *Buckley,* 200 Mass. 346, 352; *United States* v. *Harmon,* 45 Fed. 414, 418. Compare *Parmelee* v. *United States,* 113 Fed. (2d) 729, 732.

In so far as the excluded evidence was expected to show that other books of the same kind, or worse, were being sold without prosecution it was obviously incompetent. *Commonwealth* v. *Buckley,* 200 Mass. 346, 349, 350–351, 354 (request 26). See *Commonwealth* v. *Friede,* 271 Mass. 318, 322.

What has already been said covers all of the defendant's requests for rulings that were refused, excepting numbers fourteen and sixteen. Request fourteen was rightly refused on the ground stated by the judge that it makes the effect upon youth the sole test of applicability of the statute. Request sixteen asked the judge "as a matter of law" to "take into consideration the attitude of the community in accepting or rejecting the book . . . ." Since there was no evidence bearing upon the "attitude of the community," this seems to be a request that the judge take judicial notice of that "attitude." We do not feel called upon to prolong this opinion by entering upon a discussion as to whether "attitude of the community" in any of its possible aspects might have any bearing upon any of the issues before the judge. Some courts seem to have favored the taking of judicial notice of literary reviews and criticisms. *Halsey* v. *New York Society for the Suppression of Vice,* 234 N. Y. 1. *United States* v. *One Book Entitled Ulysses,* 72 Fed. (2d) 705, 708. In one case it was said that published reviews of qualified critics might reasonably be allowed "in evidence," which was said to be "quite another thing . . . from expert witnesses at the trial." *United States* v. *Levine,* 83 Fed. (2d) 156, 158. Whether these decisions are consistent with our own rules, we need not determine. Neither need we determine whether the views of literary critics show the "attitude of the community" or merely that of a very specialized part of the community, or whether they bear upon anything more than the literary value of the work. For purposes of the present case we are satisfied that the defendant could not compel the judge to commit himself to a ruling upon such vague and sweeping generalities as "attitude of the community" and "accepting or rejecting the book." These seem to us to be composite conclusions

which, if they could have been determined at all, could have been determined only by weighing subsidiary facts, some of which might perhaps be susceptible of judicial notice and others of which might well require proof by competent evidence. We cannot say that at the time of the trial the generalization, "attitude of the community in accepting or rejecting" this new book, had become in any aspect an established fact so notorious and indisputable that the judge could be compelled against his own judgment to ascertain it without evidence. Wigmore on Evidence (3d ed.) §§ 2568, 2568a.

In closing this opinion it is proper to call attention to St. 1945, c. 278, which is to take effect October 1, 1945, and which makes substantial changes in the law and adds a new procedure directed against the book itself by which a judicial determination can be had whether or not a book is obscene, indecent, or impure. This statute should go far to remedy complaints that the present law has operated unjustly in that salespeople or clerks in stores may be convicted for selling a book when the seller does not know and perhaps as a practical matter cannot know whether or not he is violating the law.

*Exceptions overruled.*

LUMMUS, J. The opinion seems to me to construe the statute rightly. My dissent is only from the conclusion that the evidence warranted a finding of guilty.

It must be conceded that the book in question is blemished by coarse words and scenes, some of which appear irrelevant to the plot. Yet in them I can discover no erotic allurement such as the opinion makes necessary for a conviction. On the contrary, their coarseness is repellent.

The book is a serious study of the relations of different races in a small southern town. It is a grim tragedy, not relieved even by humor. Virtue is not derided, neither is vice made attractive. In the book, the wages of sin is literally death. The reader is left depressed, unable to solve a tragic problem.

The opinion rests its support of the conviction upon the

statutory words "manifestly tends to corrupt the morals of youth," as well as upon the other prohibition of the statute. It asserts that "Many adolescents are avid readers of novels." The record contains no evidence to warrant that assertion, or to show that any adolescent ever read the book or would read it under normal conditions. Neither is there, in my judgment, any common knowledge upon which in the absence of evidence a court might conclude that under normal conditions the book would be read by any substantial number of adolescents. Of course, conditions that exist after prosecution for obscenity has been brought or publicly threatened, are abnormal and furnish no test of what the opinion calls the "probable audience" of the book. The market for any novel can be artificially stimulated and widened through curiosity aroused by actual or threatened prosecution in this Commonwealth, frequently to the satisfaction and profit of the publisher elsewhere.

Such knowledge as I have leads me to believe that without such artificial stimulation novels of the class into which the book in question falls are read by few girls and by practically no boys. The great mass of readers are mature women. Plainly the book was not written for juveniles. They would find it dull reading. Under normal conditions I think the book could do no substantial harm to the morals of youth, for few juveniles would ever see it, much less read it. And if by chance some should wade through it, I think it could not reasonably be found to have any erotic allurement, even for youth.