## ATTORNEY GENERAL *vs.* THE BOOK NAMED "FOREVER AMBER" & others.

Hampden.    March 2, 1948. — October 11, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, RONAN, WILKINS, SPALDING, & WILLIAMS, JJ.

*Obscene, Indecent or Impure Publication. Book. Evidence,* Competency; Relevancy and materiality; Opinion: expert. *Equity Pleading and Practice,* Findings by judge, Appeal, Proceeding against book. *Words,* "*Obscene, indecent or impure.*"

Factors in determining whether a book is obscene, indecent, or impure within § 28C, inserted in G. L. (Ter. Ed.) c. 272 by St. 1945, c. 278, § 1, are as follows: it must be treated as a whole to ascertain if it contains prohibited matter in such quantity or of such nature as to impart to the whole any of the qualities mentioned in the statute; it must be tested by its effect upon its probable readers and not upon any classification of its subject matter or of its words as being in themselves innocent or obscene; it is within the statute if, as a whole, it has a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desires; it is to be judged in the light of the customs and habits of thought of the time and place of the alleged violation of the statute; sincerity and literary art alone do not take it beyond the reach of the statute.

The provisions of § 28F, inserted in G. L. (Ter. Ed.) c. 272 by St. 1945, c. 278, § 1, did not make admissible, at the hearing of a proceeding under § 28C of that statute against a book alleged to be obscene, indecent, and impure, testimony of experts in psychiatry to the effect that the book read as a whole either had no substantial tendency to incite lascivious thoughts or arouse lustful desire on the part of the average adult reader or did not violate so called current sex mores.

In a proceeding against a book under § 28C, inserted in G. L. (Ter. Ed.) c. 272 by St. 1945, c. 278, § 1, advertisements which had been published respecting the book were not considered by this court to be a part of the book in determining whether it was obscene, indecent, or impure.

On an appeal, in a proceeding under § 28C, inserted in G. L. (Ter. Ed.) c. 272 by St. 1945, c. 278, § 1, from a final decree adjudging a book "not obscene, indecent, or impure," where the record contained the evidence, including the book, and a statement of "findings, rulings, and order for decree," this court reached their own conclusions upon documentary evidence, such as the book, irrespective of those reached by the trial judge, and made findings upon oral testimony in addition to findings made by him; but affirmed the decree.

On appeal from a decree in a proceeding under § 28C, inserted in G. L. (Ter. Ed.) c. 272 by St. 1945, c. 278, § 1, adjudging a certain book "not obscene, indecent, or impure," the decree was affirmed where this court determined that the book as a whole was a real attempt to portray life in England at the court of Charles II, the stage, and costumes of the period, and that, although it abounded in sexual episodes to the point of tedium, a full reading of it left a paramount impression merely of an unfortunate country and its people with its great city ravaged by disaster and by disease, and of individual characters forming an unattractive, hedonistic group whose course of conduct was abhorrent and whose mode of living could be neither emulated nor envied.

PETITION IN EQUITY, filed in the Superior Court on May 22, 1946, under G. L. (Ter. Ed.) c. 272, §§ 28C–28G, as inserted by St. 1945, c. 278, § 1.

The case was heard by *Donahue*, J.

The case was argued at the bar in March, 1948, before *Qua*, C.J., *Ronan, Wilkins, Spalding,* & *Williams*, JJ., and afterwards was submitted on briefs to all the Justices.

*G. B. Rowell*, Assistant Attorney General, for the petitioner.

*H. Williams*, for the Board of Trade of the Boston Book Merchants and another.

*A. Lindey*, (*M. Rosenman* with him,) for The Macmillan Company.

WILKINS, J.    A petition in equity seeking an adjudication that the novel "Forever Amber" is obscene, indecent, or impure invokes the procedure newly afforded by G. L. (Ter. Ed.) c. 272, §§ 28C–28G, as inserted by St. 1945, c. 278, § 1.    Answers were filed by The Macmillan Company, the publisher; by Johnson's Bookstore, Inc., which had in its possession in Springfield copies of the book for the purpose of sale, loan, or distribution; and by the Board of Trade of the Boston Book Merchants, an association in Boston of those engaged in the sale, loan, and distribution of books, including the book in question.    From a final decree in favor of the book the Attorney General appealed.

Statute 1945, c. 278, entitled "An Act relative to the importing, printing, publishing, selling or distributing of obscene books and other obscene matter," repealed G. L. (Ter. Ed.) c. 272, § 28, as most recently amended by St.

1943, c. 239, and substituted nine new sections, which deal comprehensively with the subject matter of the title. Specifically affected are books, pamphlets, ballads, printed papers, phonographic records, prints, pictures, figures, images, and "description[s]." We are not concerned with the new § 28, which relates mainly to youth, [1] or with § 28A, which does not, expressly at least, refer to books. Section 28B reads: "Whoever imports, prints, publishes, sells, loans or distributes, or buys, procures, receives, or has in his possession for the purpose of sale, loan or distribution, a book, knowing it to be obscene, indecent or impure, shall be punished by imprisonment for not more than two years or by a fine of not less than one hundred nor more than one thousand dollars, or both."

The ensuing sections govern these proceedings. Section 28C reads in part: "Whenever there is reasonable cause to believe that a book which is being imported, sold, loaned or distributed, or is in the possession of any person who intends to import, sell, loan or distribute the same, is obscene, indecent or impure, the attorney general, or any district attorney within his district, shall bring an information or petition in equity in the superior court directed against said book by name. Upon the filing of such information or petition in equity, a justice of the superior court shall, if, upon a summary examination of the book, he is of opinion that there is reasonable cause to believe that such book is obscene, indecent or impure, issue an order of notice, returnable in or within thirty days, directed against such book by name and addressed to all persons interested in the publication, sale, loan or distribution thereof, to show cause why said book should not be judicially determined to be obscene, indecent or impure."

There are provisions for notice by publication, for notice by registered mail to the publisher, the copyright holder, and the author, and for an interlocutory adjudication that the book is obscene, indecent, or impure (§ 28C); for appearance, answer, and claim of jury trial by any person interested in the sale, loan, or distribution of the book

---

[1] See St. 1948, c. 328.

(§ 28D); for "a general default" where no one appears and answers; and in that event for an adjudication against the book provided the court finds it to be obscene, indecent, or impure (§ 28E).

The method of conducting a hearing is prescribed in § 28F: "If an appearance is entered and answer filed, the case shall be set down for speedy hearing, but a default and order shall first be entered against all persons who have not appeared and answered, in the manner provided in section twenty-eight E. Such hearing shall be conducted in accordance with the usual course of proceedings in equity including all rights of exception and appeal. At such hearing the court may receive the testimony of experts and may receive evidence as to the literary, cultural or educational character of said book and as to the manner and form of its publication, advertisement, and distribution. Upon such hearing, the court may make an adjudication in the manner provided in said section twenty-eight E."

An information or petition in equity "shall not be open to objection on the ground that a mere judgment, order or decree is sought thereby [1] and that no relief is or could be claimed thereunder on the issue of the defendant's knowledge as to the obscenity, indecency or impurity of the book" [2] (§ 28G). Section 28H undertakes to provide that in criminal prosecutions under § 28B there shall be certain so called conclusive presumptions based upon the commencement of proceedings under § 28C or upon an adjudication in such proceedings.

At the hearing the Attorney General introduced in evidence the novel, which has its setting in England during the Restoration. The publisher introduced evidence as to its publication and advertising, and called as witnesses two experts in psychiatry. The association of Boston book merchants and Johnson's Bookstore, Inc., called as a witness an expert on the literature of the period. A third expert in psychiatry testified in rebuttal on behalf of the Attorney General.

---

[1] Compare G. L. (Ter. Ed.) c. 231A, as inserted by St. 1945, c. 582, § 1.
[2] See G. L. (Ter. Ed.) c. 272, § 28B, as inserted by St. 1945, c. 278, § 1.

In his "findings, rulings and order for decree" the judge said: "'Forever Amber,' written by Kathleen Winsor, an author hitherto unknown to fortune or to fame, was published by the Macmillan Company, a long established house of eminence and respectability in the book trade. The publication date was October 16, 1944, and the first printing of the book was 52,000 copies. Up to January 1, 1947, 1,300,000 copies had been sold. A British edition has been published and 100,000 copies of that sold. It was selected by the committee to select reading for the Armed Services and an Armed Services edition of 140,000 copies was printed and distributed. Rights to translate the book into thirteen different languages have been sold. [A company] . . . has purchased the moving picture rights. Condensed versions of the book have been carried in . . . magazines. . . . There were 137 newspaper, 37 magazine and 14 radio reviews of the book. It was reviewed in practically every city of importance and in all parts of the country. . . . [The book] contains 652 double-column pages and about 325,000 words. It is not easy reading and required several hours of my time every day for seven days to get through it. . . . Sexual episodes are numerous, mostly those of Amber's life, but also many of others. The book goes into no details of sexual relations which might arouse erotic emotions and lead to immoral behavior. . . . The question is whether the book as a whole is 'obscene, indecent or impure.' . . . I find that the book 'Forever Amber' is not 'obscene, indecent or impure.'"

For interpretation of the words "obscene, indecent or impure" our present duty does not require us to look beyond the recent criminal case of *Commonwealth* v. *Isenstadt*, 318 Mass. 543. A book is to be treated as a whole (pages 548–549). "It is not to be condemned merely because it may contain somewhere between its covers some expressions which, taken by themselves alone, might be obnoxious to the statute." A "book is within the statute if it contains prohibited matter in such quantity or of such nature as to flavor the whole and impart to the whole any of the qualities mentioned in the statute, so that the book as a whole can

fairly be described by any of the adjectives or descriptive expressions contained in the statute" (page 549). The test is "the effect of the book upon its probable readers and not in any classification of its subject matter or of its words as being in themselves innocent or obscene. A book is 'obscene, indecent or impure' within the statutory prohibition if it has a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire" (pages 549–550). "The prohibitions of the statute are concerned with sex and sexual desire" (page 550). A "book is to be judged in the light of the customs and habits of thought of the time and place of the alleged offence" (page 551). But sincerity and literary art alone do not bring it beyond reach of the statute (pages 552–554). "The question will commonly be one of fact in each case, and if, looking at the book as a whole, the bad is found to persist in substantial degree alongside the good, as the law now stands, the book will fall within the statute" (page 554).

The Attorney General excepted because the experts on psychiatry called by the publisher were permitted to answer numerous questions which in substance sought to elicit testimony that the book read as a whole either (1) has no substantial tendency to incite lascivious thoughts or arouse lustful desire on the part of the average adult reader or (2) does not violate current sex mores. The term "sexual mores of society," as defined by one witness, "means sexual behavior in our time and our culture, and will define the deviations which are possible from the average behavior and delineate these against normal behavior." It was error to admit testimony for either purpose. We need add nothing to what we said in these respects with full citation of authorities in *Commonwealth* v. *Isenstadt*, 318 Mass. 543, 558–560. To be sure, that case antedated the effective date of the present statute, but nothing in the quoted portion of § 28F makes admissible expert evidence irrespective of the field in which a witness may have unusual qualifications. It could not be contended that the evidence in question relates "to the literary, cultural or

educational .character of said book" or "to the manner and form of its publication, advertisement, and distribution." We, accordingly, must disregard it.

· Some of the publisher's advertising was not in the highest taste, and was not limited to stressing literary or historical qualities. For example, on occasions there was an exhortation to the reading public that "in 'Forever Amber' [there] is a heroine who will remind them of Scarlett O'Hara and Catherine the Great rolled into one dainty package of dynamite and surrounded by a score of inflammable young Casanovas from the corrupt court of Charles II." Another time the potential reader is assured that the authoress "Transports you back to the boisterous, brilliant, bawdy days of Charles II's England." The advertisements, however, are not part of the novel, which in final analysis must meet the test of the statute upon what is contained within its own covers.

The expert on literature testified that as a historical romance of the period, and "in giving the small group of persons with whom it deals," "Forever Amber" is at least as correct as the romances of Cooper or Scott; that it is evident from the book that the author has stated with great care the manner of the period in these respects; that the dialogue more or less faithfully reflects what we have recorded of the language and conversation of the period; that these matters indicate a certain amount of study and research; that it is a work of secondary order but with considerable narrative drive; that it is somewhat similar to "Roxana" and "Moll Flanders" by Daniel Defoe; that these and other works of Restoration literature, commonly found in college libraries, "essentially hold a thorough understanding of the age," which was extremely cynical; that "Forever Amber" is sufficiently accurate for the purpose of representing a portrait of the period and its customs and morals; that it does not exaggerate or falsify any traits of the Restoration, if by that is meant the conduct and language of the small group around Charles II, which is the subject of the book; and that it would not be possible to write a historically accurate novel about the Restoration

with reference to the court, ignoring the sexual theme. We find the foregoing to be facts.

The statute, as we have seen, provides that the "hearing shall be conducted in accordance with the usual course of proceedings in equity including all rights of exception and appeal" (§ 28F). Hence upon appeal the findings of the trial judge based upon oral testimony will not be reversed unless plainly wrong, but where there are findings based upon documentary evidence, such as this book, we reach our own conclusions unaffected by them. *Harvey-Watts Co.* v. *Worcester Umbrella Co.* 193 Mass. 138, 142–143. *Bratt* v. *Cox*, 290 Mass. 553, 557–558. *Malden Trust Co.* v. *Brooks*, 291 Mass. 273, 279. *Berry* v. *Kyes*, 304 Mass. 56, 57–58. *Veazie* v. *Staples*, 309 Mass. 123, 127. *Eno* v. *Prime Manuf. Co.* 314 Mass. 686, 700–701. From the reported evidence we may make additional findings not made by the trial judge. *Lowell Bar Association* v. *Loeb*, 315 Mass. 176, 178. And with respect to the advertising and the testimony of the expert on literature we have done so.

In accordance with the principles outlined above it remains for us to make our own determination whether "Forever Amber" is obscene, indecent, or impure under the statute. It readily will be observed that the present scope of review is substantially unlike that which confronted us in *Commonwealth* v. *Isenstadt*, 318 Mass. 543, 556, where we said, "The test is not what we ourselves think of the book, but what in our best judgment a trier of the facts might think of it without going beyond the bounds of honesty and reason."

The book in the case at bar, when read in its long entirety, in the opinion of a majority of the court, does not offend against the statute. It undoubtedly has historical purpose, and in this is adequately accurate in achievement. The career of the heroine, an illegitimate child of noble blood, is traced from an upbringing in a rustic environment through the vicissitudes of her life in or near London until she becomes a duchess and the mistress of Charles II. She has numerous lovers and bears three children by men whom she does not marry. She enters into four marriages, of

which only the first appears to have been lawful. She fails in her main objective of marriage to the one man she genuinely loves. There are detailed descriptions of Newgate Prison, the Great Plague, and the Great Fire. A real attempt is made to portray life at the court of Charles II, the stage, and the costumes of the period. Some descriptions the Attorney General in his brief concedes to be excellent. Many notable figures prominent in the Restoration appear from time to time, and their imaginary conversations are recorded. Unfortunate it is that sexual episodes abound to the point of tedium. For the most part, however, such episodes are lacking in realistic detail, although some are coarse and in a taste foreshadowed by the advertising. We are not required to decide whether standing by themselves any are obscene, indecent, or impure. Once the full task of reading the total of six hundred and fifty-two double-column pages has been completed, the paramount impression is of an unfortunate country and its people as yet unfreed of the grasp of the Stuarts, whom Charles Dickens appraised as "a public nuisance altogether," and of its great city ravaged by disaster and by disease. As to the individual characters, the reader is left with an estimate of an unattractive, hedonistic group, whose course of conduct is abhorrent and whose mode of living can be neither emulated nor envied.

*Decree affirmed.*

