ADRIAN P. BURKE, as Corporation Counsel of the City of New York, Plaintiff, *v.* KINGSLEY BOOKS, INC., et al., Defendants.

Supreme Court, Special Term, New York County, June 13, 1955.

Adrian P. Burke, Former Corporation Counsel, and Peter Campbell Brown, Corporation Counsel (Milton Mollen and Murray Rudman of counsel), for plaintiff.

Emanuel Redfield for Kingsley Books, Inc., and another, defendants.

Sidney Glasser for Louis Finkelstein, doing business as Times Square Book Shop, defendant.

MATTHEW M. LEVY, J. The Penal Law of this State has for some time made it a misdemeanor to sell or distribute " any obscene, lewd, lascivious, filthy, indecent or disgusting book, magazine, pamphlet, newspaper, story paper, writing, paper, phonograph record, picture, drawing, photograph, motion picture film, figure or image, or any written or printed matter of an indecent character " (Penal Law, § 1141, subd. 1). More recently, the Legislature enacted section 22-a of the Code of Criminal Procedure, providing that, " The supreme court has jurisdiction to enjoin the sale or distribution of obscene prints and articles " as defined there and in section 1141 of the Penal Law, and in the event that a final judgment of injunction be issued, the judgment " shall contain a provision directing the person, firm or corporation [against whom the injunction is granted] to surrender to the sheriff of the county in which the action was brought any of the matter described in paragraph one hereof and such sheriff shall be directed to seize and destroy the same ". The code section provides further that the person authorized to maintain the action is the chief executive or legal officer in any city, town or village in the State (subd. 1). In the city of New York, the latter official would be the corporation counsel.

Pursuant to section 22-a, the plaintiff, as corporation counsel of the City of New York, has instituted this action against a number of persons, firms and corporations, for the purpose of (1) permanently enjoining the defendants from acquiring, selling or distributing any of the issues of a series of booklets entitled " Nights of Horror "; (2) directing the defendants to surrender to the Sheriff of the County of New York all issues

of the publication within their possession and control; and (3) directing the Sheriff to seize and destroy them. Those defendants who have answered deny the allegation of the complaint that the publication is obscene, and in effect interpose three separate defenses: that the plaintiff lacks the required legal authority to maintain this action; that section 22-a is an unconstitutional restraint on freedom of the press; and that section 22-a violates the constitutional protection against unreasonable seizures. This case has been considered by the parties, and found by the court, to be the first submission of the constitutional issues thought to be involved in the application of section 22-a. (The statute is set forth in the margin.) *

* Section 22-a of the Code of Criminal Procedure as amended by chapter 702 of the Laws of 1954, effective July 1, 1954:

The Supreme Court has jurisdiction to enjoin the sale or distribution of obscene prints and articles, as hereinafter specified:

1. The chief executive officer of any city, town or village or the corporation counsel, or if there be none, the chief legal officer of any city, town, or village, in which a person, firm or corporation sells or distributes or is about to sell or distribute or has in his possession with intent to sell or distribute or is about to acquire possession with intent to sell or distribute any book, magazine, pamphlet, comic book, story paper, writing, paper, picture, drawing, photograph, figure, image or any written or printed matter of an indecent character, which is obscene, lewd, lascivious, filthy, indecent or disgusting, or which contains an article or instrument of indecent or immoral use or purports to be for indecent or immoral use or purpose; or or[1] in any other respect defined in section eleven hundred forty-one of the penal law, may maintain an action for an injunction against such person, firm or corporation in the supreme court to prevent the sale or further sale or the distribution or further distribution or the acquisition or possession of any book, magazine, pamphlet, comic book, story paper, writing, paper, picture, drawing, photograph, figure or image or any written or printed matter of an indecent character, herein described or described in section eleven hundred forty-one of the penal law.

2. The person, firm or corporation sought to be enjoined shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial.[2]

3. In the event that a final order or judgment of injunction be entered in favor of such officer of the city, town or village and against the person, firm or corporation sought to be enjoined, such final order of judgment shall contain a provision directing the person, firm or corporation to surrender to the sheriff of the county in which the action was brought any of the matter described in paragraph one hereof and such sheriff shall be directed to seize and destroy the same.

4. In any action brought as herein provided such officer of the city, town or village shall not be required to file any undertaking before the issuance of an injunction order provided for in paragraph two hereof, shall not be liable for costs and shall not be liable for damages sustained by reason of the injunction order in cases where judgment is rendered in favor of the person, firm or

The act of obscenity has been an offense against the public order for centuries (see Sir Charles Sydlyes Case, 1 Keble 620 [K. B. 1663]; Harris and Wilshere on Criminal Law [16th ed.], pp. 169–170; 1 Bishop on Criminal Law [9th ed.], §§ 500, 504; and Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40–43). Printed obscenity has been deemed a crime at common law for generations (*Commonwealth* v. *Holmes,* 17 Mass. 336; see Grant and Angoff, Massachusetts and Censorship, 10 Boston Univ. L. Rev. 52–56). The essence of the statute now known as section 1141 of the Penal Law was first enacted in the State of New York in 1881 (Penal Code, § 317). " It is to be observed that the statute [then Penal Code, § 317] does not undertake to define obscene or indecent pictures or publications. But the words used in the statute are themselves descriptive. They are words in common use, and every person of ordinary intelligence understands their meaning " (*People* v. *Muller,* 96 N. Y. 408, 410).

The fact that the mores of the times change from one generation to another, or that they are not the same in every land and clime, does not render the statutory definition meaningless (see LEARNED HAND, J., in *United States* v. *Kennerley,* 209 F. 119, 121). Of course, to be constitutionally valid, what is statutorily interdicted " must be defined with appropriate definiteness " (*Pierce* v. *United States,* 314 U. S. 306, 311). Thus it is that " immoral " (*Superior Films* v. *Department of Educ.,* 346 U. S. 587, revg. *Matter of Commercial Pictures Corp.* v. *Board of Regents,* 305 N. Y. 336), " injurious to public morals " (*Musser* v. *Utah,* 333 U. S. 95), and " collections of criminal deeds of bloodshed or lust " (*Winters* v. *New York,* 333 U. S. 507, 513) have been held to provide no reasonable, ascertainable standards. In order for the Legislature to achieve reasonable certainty — within constitutional limitations — it is not, however, necessary that the language be narrowed in such a manner as to allow no flexibility; rather, ordinary terms may be used to express ideas which adequately describe that which is prohibited

corporation sought to be enjoined.

5. Every person, firm or corporation who sells, distributes, or acquires possession with intent to sell or distribute any of the matter described in paragraph one hereof, after the service upon him of a summons and complaint in an action brought by such officer of any city, town or village pursuant to this section is chargeable with knowledge of the contents thereof.

[1] So in enrolled bill. Second "or" probably should be omitted.
[2] By stipulation entered upon the record, the parties duly waived this requirement, and the court therefore did not consider the propriety of this provision in the statute.

when measured by the modes of common usage and understanding in the community (*Sproles* v. *Binford*, 286 U. S. 374, 393; *Jordan* v. *De George*, 341 U. S. 223, 231–232).

Repeated challenges to the definiteness of the term " obscene " have been rejected (*Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572; *American Civil Liberties Union* v. *City of Chicago*, 3 Ill. 2d 334, 347; Lockhart and McClure, Literature, The Law of Obscenity, and The Constitution, 38 Minn. L. Rev. 295, 324–350). There is no question but that the term " obscene " is sufficiently definite to be used — even in a criminal statute (*Winters* v. *New York*, 333 U. S. 507, 518, *supra*). " The legislature has declared in this section [Penal Law, § 1141] that no obscene, lewd, lascivious or disgusting book shall be sold. Language could not be plainer." (CRANE, J., dissenting, in *Halsey* v. *New York Soc. for Suppression of Vice*, 234 N. Y. 1, 14.) And while it has been thought (*United States* v. *Reese*, 92 U. S. 214) that it is not necessarily a basis for vital distinction that a statute imposes no criminal sanctions (and that is true of § 22-a, although it is incorporated in the Code of Criminal Procedure), it is recognized that " [t]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement " (*Winters* v. *New York*, 333 U. S. 507, 515, *supra*).

Some of the defendants have denied that the publications fall within the proscription of section 22-a. The classic legal test for obscenity is " whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall " (*Regina* v. *Hicklin*, L. R. [1868] 3 Q. B. 360, 371). This definition, expressed long ago, seems rather strict and has been often criticized (*United States* v. *One Book Called " Ulysses "*, 5 F. Supp. 182, affd. *United States* v. *One Book Entitled Ulysses*, 72 F. 2d 705; *United States* v. *Levine*, 83 F. 2d 156; *United States* v. *Dennett*, 39 F. 2d 564; *United States* v. *Kennerley*, 209 F. 119, *supra*; Ernst and Lindey, The Censor Marches On, pp. 2, 22, 188; Buchsbaum, Constitutional Law — Censorship — Statutory Construction, 16 Ga. B. J. 494; Lockhart and McClure, *supra*, pp. 326–350). It nevertheless appears to be the standard sustained by our Court of Appeals (*People* v. *Doubleday & Co.*, 297 N. Y. 687, affd. 335 U. S. 848; *People* v. *Muller*, 96 N. Y. 408, 411, *supra*; *People* v. *Berg*, 241 App. Div. 543, affd. 269 N. Y. 514; but see *People* v. *Wendling*, 258 N. Y. 451, 453).

The only question before the court in *Besig* v. *United States* (208 F. 2d 142), was whether the books were obscene. Obscene was defined (p. 145) as "indecent, smutty, lewd or salacious reference to parts of the human or animal body or to their functions * * * ". The court found the books in that case to be just that, and the language therein "related without the slightest expressed idea of its abandon ". Judge STEPHENS felt that not only must the young and pure be protected, but that the Congress must have realized, when the statute there involved (U. S. Code, tit. 19, § 1305, subd. [a]) was passed, " that salacious print in the hands of adults, even in the hands of those whose sun is near the western horizon, may well incite to disgusting practices and to hideous crime " (*Besig* v. *United States, supra*, p. 146). The court continued: " We share the general antipathy to censorship and we are aware that individual tastes and special occasions and different times and different peoples differ as to what is offensive language. Yet we risk the assertion that there is an underlying, perhaps universal, accord that there is a phase of respectable delicacy related to sex, and that those compositions which purposefully flaunt [flout?] such delicacy * * * come under the ban of the statute." (P. 147.)

In determining what is obscene in any particular case, " [t]he law will not hold the crowd to the morality of saints and seers " (Cardozo on Paradoxes of Legal Science, p. 37). Neither will the law honor the views of the bestial and the debased. Nor should it be governed by the morals of the prude on the one hand or of the perverted on the other. " All that we can say is that the line will be higher than the lowest level of moral principle and practice, and lower than the highest." (Cardozo, *supra*, p. 37.) Sex relationships can be and normally are beautiful, profound, inspiring and healthy. And some of the finest literature of all time — of fact and fancy, lasting and cherished through the ages — has presented and discussed, analyzed and novelized the concept of sex. Not so the present publications. If ever there could be found appropriate applicability for section 22-a, this case emerges as the perfect example of what the Legislature has sought to curb. Judge LEARNED HAND felt that the word " obscene " should " be allowed to indicate the present critical point in the compromise between candor and shame " (*United States* v. *Kennerley*, 209 F. 119, 121, *supra*). No such problem is here presented; for " Nights of Horror " will be found resting at the foot of the scale, clearly marked " shame ". No matter how strict the test or how broad the criteria, these volumes will readily measure up to and even

surpass the most generous standard. The booklets in evidence offer naught but glorified concepts of lustful and vicious concupiscence, and by their tenor deride love and virtue, invite crime and voluptuousness, and excite lecherous desires (see *People* v. *Wendling*, 258 N. Y. 451, 453, 454). There is no true dissemination of lawful ideas — rather is there a direct incitement to sex crimes and the sordid excitement of brutality. These booklets are sold indiscriminately to all who may wish to purchase them — men and women, adults and youths of both sexes. The publications have a libidinous effect upon ordinary, normal, healthy persons; their effect upon the abnormal individual may be disastrous to him and to others as well.

These booklets are not sex literature, as such, but pornography, unadulterated by plot, moral or writing style. That there is no attempt to achieve any literary standard is obvious. Each issue is a paper-covered booklet of from seventy to ninety-six pages, with a suggestive sex drawing on the front cover under the caption " Nights of Horror ". The price varies from $1.98 to $3 per issue. The volumes are replete with misspelled words, typographical errors, faulty grammar, misplaced pages and generally poor workmanship. While these factors do not, of course, classify the issues as pornographic, they are somewhat helpful in ascertaining whether there truly exists a geninue literary intent. " Nights of Horror " makes but one " contribution " to literature. It serves as a glossary of terms describing the private parts of the human body (notably the female breasts, buttocks and vagina), the emotions sensed in illicit sexual climax and various forms of sadistic, masochistic and sexual perversion. The volumes before me are not a description of a period of history or the people and characters of an earlier time and of their conduct and habits of life. They are not a relating of folk tales or stories of primitive people living in isolated regions. They do not purport to depict the lives and customs of those who are here now or are expected to inhabit this land or this earth in the time to come (see *People* v. *Berg*, 241 App. Div. 543, 544, affd. 269 N. Y. 514, *supra*).

" Nights of Horror " is no haphazard title. Perverted sexual acts and macabre tortures of the human body are repeatedly depicted. The books contain numbers of acts of male torturing female and some vice versa — by most ingenious means. These gruesome acts included such horrors as cauterizing a woman's breast with a hot iron, placing hot coals against a woman's breasts, tearing breasts off, placing hot irons against a female's armpits, pulling off a girl's fingernails with white-hot pincers,

completely singeing away the body hairs, working a female's skin away from her flesh with a knife, gouging and burning eyes out of their sockets, ringing the nipples of the breast with needles. Hanging by the thumbs, hair pulling, skin burning, putting on bone-compressing iron boots, were usual. The torture rack abounded. Self-torture was frequent. Sucking a victim's blood was pictured; and so was pouring molten lead into a girl's mouth and ears; and putting honey on a girl's breasts, vagina and buttocks — and then putting hundreds of great red ants on the honey. Sodomy, rape, lesbianism, seduction prevail. Youngsters disrobing in the presence and to the detailed recorded delight of elderly males was described. Incidental training of the teen-ager to narcotic addiction and sexual perversion was part of the activities engaged in. The volumes expressed a philosophy of man's omnipotent physical power over the female of the species. On occasion, the young woman is said to have gained satisfaction from the brutal beatings and horrible tortures. If she did not enjoy them, she received the beatings and tortures anyway — until she submitted to the sex acts desired by her tormentor. These brutalities were " my supreme pleasure " to the male, and resulted in " I'll be your slave " to the female. (It is not to be taken that I have, in any measure, given a complete report of the " Nights of Horror ". I felt that I had to mention some, not the most sordid, features of this publication in view of the serious issues raised in this case — but I need not, I think, describe all I was compelled to read.)

While it appears, as a study of earlier cases will indicate, that some courts have held a publication obscene on the basis of selected passages (*United States* v. *Bennett,* 16 Blatchf. 338; *Commonwealth* v. *Friede,* 271 Mass. 318; *Commonwealth* v. *Buckley,* 200 Mass. 346) each volume here was read (a distasteful task, it turned out to be — to say the least) to determine whether, taken as a whole, it was obscene within the proscription of the statute (*Halsey* v. *New York Soc. for Suppression of Vice,* 234 N. Y. 1, 4, *supra; Besig* v. *United States,* 208 F. 2d 142, 146, *supra; Commonwealth* v. *Isenstadt,* 318 Mass. 543, 548–549; *United States* v. *One Book Called " Ulysses ",* 5 F. Supp. 182, 185, affd. *United States* v. *One Book Entitled Ulysses,* 72 F. 2d 705; *Roth* v. *Goldman,* 172 F. 2d 788, 790 [FRANK, J., concurring]). Suffice it to say at this point that there is not a single " story " which is not " obscene, lewd, lascivious, filthy, indecent or disgusting." ** More often than not these adjectives must be

---

** From time to time throughout this opinion, for purposes of convenience, I use the single word " obscene " rather than the several words of the statute.

used in combination, and with many others in the same vein, to describe adequately any one issue. The whole here is " emetic " and " aphrodisiac " (see *United States* v. *One Book Called " Ulysses "*, 5 F. Supp. 182, 185, *supra*).

The authors have left nothing to fantasy or to the unimaginative mind. The volumes are vividly detailed and illustrated. The many drawings that embellish these stories are obviously intended to arouse unnatural desire and vicious acts. Violence — criminal, sexual — degradation and perversion — are the sole keynote. Sadism and masochism are pictured as appropriate characteristics of human nature and pleasure. In short, the volumes of " Nights of Horror " in evidence before me are obscene and constitute pornography — " dirt for dirt's sake " (*United States* v. *One Book Called " Ulysses "*, 5 F. Supp. 182, 184, *supra*), bestiality, lust, crime, horror, for their unfortunate sake — and for the ugly sake of filthy commerce in human weakness. Anne Lyon Haight has compiled a revised and enlarged edition of "Banned Books: Informal Notes on Some Books Banned for Various Reasons at Various Times and in Various Places " (2d ed., 1955). This chronological list of books banned from 387 B.C. to 1954 A.D. (with no attempt to be all inclusive) was compiled with the idea of showing the trend of censorship throughout the years and the change in thought and taste. Most of the books there recorded fall under a ban because of religion, politics or morality, making the offense one of heresy, treason or obscenity. Among them are books which have withstood the condemnation of their immediate times to become the classics of today. " Nights of Horror " does not deserve to be listed among the missing when the next edition of " Banned Books " is published.

It is urged by all of the contesting defendants that, notwithstanding any determination that I make as to the obscene character of " Nights of Horror ", section 22-a is unconstitutional on its face and therefore void. It is contended, firstly, that the statute violates Federal and State constitutional guarantees against interference with a free press; and, secondly, that in part it violates constitutional protections against unlawful seizures. I shall examine these points separately.

The First Amendment to the Constitution of the United States provides that " Congress shall make no law * * * abridging the freedom of speech, or of the press ". The First Amendment is applicable to the several States via the due process clause of the Fourteenth Amendment (*Gitlow* v. *New York*, 268 U. S. 652, 666; *Near* v. *Minnesota*, 283 U. S. 697, 707;

*Grosjean* v. *American Press Co.*, 297 U. S. 233, 249). Section 8 of article I of the Constitution of the State of New York, provides that "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press". Each of these constitutional provisions is a grave mandate requiring sincere and primary recognition when legislation is challenged as running afoul of their powerful protection, and, in my view, compels devoted judicial obeisance.

No doubt, " the rights of the best of men are secure only as the rights of the vilest and most abhorrent are protected." (POUND, J., dissenting, in *People* v. *Gitlow*, 234 N. Y. 132, 158, affd. 268 U. S. 652.) And no doubt, too, the rights of the best of books are dependent upon the judicial protection to be afforded those having the least social value. Indeed, even publications of no social worth are entitled to be shielded from unlawful or unconstitutional restraint. (*Winters* v. *New York*, 333 U. S. 507, 510, *supra*). Were the " Nights of Horror " works which indicated the slightest effort to contribute to our culture or knowledge, I might find myself in the position of " holding my nose with one hand " and "upholding with the other the right of free speech " that they are claimed to represent (see Judge CURTIS BOK, " If We Are to Act Like Free Men ", Saturday Review, Feb. 13, 1954, pp. 9, 10, col. 3). But the volumes before me are so totally lacking in merit, and so obviously pornographic in intent, that their banning poses no threat to freedom of expression in literature or otherwise. To borrow a thought from Judge LEARNED HAND, I can well say that the plea of the present defendants, invoking the sacred constitutional guaranty of free press, is an effort to " misuse the privilege as a cover for lewdness and a stalking horse from which to strike at purity " (*United States* v. *Kennerley*, 209 F. 119, 121, *supra*).

I would not want or (if I could avoid it) permit this court to become a licensor, a censor, a book burner. But a judicial tribunal should not and cannot avoid its responsibility. " Publications found by fair process to violate literate, adult and clearly defined standards of decency or other criminal safeguards can serve no useful purpose for the community, and [judicial(?)] interference with their dissemination we find nonobjectionable." (Report on Book Burning, Committee on The Bill of Rights [Record], Association of Bar of City of N. Y. Vol. 10, No. 3, March, 1955, p. 143.)

At this point, I shall note two cardinal and basic tenets for my view that the statute is not vulnerable on the ground of an allegedly unconstitutional infringement of the freedom of the press — that of " clear and present danger " and that of " no prior restraint ". Let me delineate.

In cases involving fundamental human liberties — such as freedom of the press — there must (and properly should) be shown, before there may be suppression, a " clear and present danger " of the substantive evils which the Legislature has a right to prevent (*Schenck* v. *United States,* 249 U .S. 47, 52; followed in *Dennis* v. *United States,* 341 U. S. 494; *Thornhill* v. *Alabama,* 310 U. S. 88, 105) and the court has a concomitant obligation to enforce. Police power may be exercised only when the public generally requires such interference and not to protect the interests of a particular class (*Lawton* v. *Steele,* 152 U. S. 133, 137). The well-supervised adolescent and the well-disciplined adult are not those whom all law must be designed to shield. It cannot, I think, seriously be gainsaid that the public generally does have a vital interest in shielding the immature mind (of whatever age) from lust-stimulating and vice-arousing pornography. There are numbers of our population who, although they have reached majority, harbor dormant criminal instincts that are easily aroused by the pornographic script, the violent narration and the indecent picture. It may be thought that to keep " Nights of Horror " from the young in years would require only legislation similar to those criminal laws regulating sale of alcoholic beverages, tobacco and firearms; but that appears to have been considered by the Legislature not to be enough — and not without some basis. (Nor, unfortunately, have public education, religious training, parental guidance and psyschiatric care been the complete solution.)

While section 1141 of the Penal Law was designed to punish the offenders, that has been found not to be sufficient (Report of the New York State Joint Legislative Committee to Study the Publication of Comics, Leg. Doc. [1954] No. 37, p. 32). The Penal Law provides for punishment of the guilty, but the susceptible public remains contaminated with pornographic filth and stimulation. So long as enforcement of this criminal law is not effective (for whatever reason), and so long as publishers and distributors are willing to risk spasmodic mis-demeanor convictions for the huge profits which apparently accrue from the exploitation of pornographic vice, section 22-a was deemed necessary. And if one is willing to risk (and unable

to escape) repeated punishment for the sake of keeping an obscene publication alive, he could go to (and for a time remain. in) jail, but his obscenity would survive. It was not considered in the best interests of the State to have jail cells overcrowded, be it with publishers and distributors who have violated section 1141 of the Penal Law or with teen-agers and others whose latent abnormal emotions have become aroused by such lascivious and vicious material as that which makes up the " Nights of Horror ". The legislative intent and purpose are to keep such books as the " Nights of Horror " from the impressionable public. While this court has sufficient confidence in the people of this State to feel that " Nights of Horror " can never survive, the immediate and long-range public interests were thought by the Legislature to require that the death blow be hastened. The legislative committee found that " the reading of these publications contributes to juvenile delinquency, stimulates sexual desire, lowers standards of morality and interferes with the normal development of sexual tendencies in both adolescents and adults ". (Report, *supra,* pp. 34–35.) The Legislature held injunction and suppression to be the only effective means to combat such a malignancy. It is not for the court — on the evidence before me — to say that there is no basis for this legislative finding and that the suggested remedy in these times is necessarily wrong. Indeed, no evidence whatsoever was sought to be submitted by the defendants which would tend in any way to challenge or controvert the legislative finding.

I do not consider censorship generally in the best public interest; and I would take a different view of *literature* even though it contained matter involving sex and crime. But the proof submitted on behalf of the plaintiff, a reading of the several issues of the " Nights of Horror ", the studies and reports of the New York State Joint Legislative Committee to study the publication of comics, of the Special United States Senate Judiciary Subcommittee on Juvenile Delinquency, and of the Select Committee of the United States House of Representatives on Current Pornographic Materials, and our everyday observations of the shocking rise of juvenile delinquency and sex crimes — all these lead us more easily to read the scale of public interests which plead for the suppression of these publications. All these indicate such a clear and present danger of substantive evils that, as a judge, I cannot ignore the cry unless the Constitution says I must. I do not find that it does. On the contrary, while there appears to be no case in point, I do cite what the

Supreme Court of the United States had occasion to say in *Chaplinsky* v. *New Hampshire* (315 U. S. 568, 571–572) : " Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene * * *. [S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (See, also, *Ex Parte Jackson,* 96 U. S. 727, 736.)

The defendants argue that section 22-a is an unconstitutional violation of free speech in that it enforces a " previous restraint " upon the dissemination of ideas. I do not agree. To assume, even *arguendo,* as the defendants do, that the Legislature may constitutionally provide that one who publishes obscene matter is subject to criminal prosecution and imprisonment (see *Winters* v. *New York,* 333 U. S. 507, 518, *supra,* and *Chaplinsky* v. *New Hamsphire,* 315 U. S. 568, 571–572, *supra*) and yet cannot be civilly enjoined from the continued distribution of that same matter, is indulging in a misapprehension as to what is really meant by " prior restraint " — and, on the basis of that misconstruction, is making a fetish of semantics rather than pleading a sound constitutional principle. I recognize that those concerned with freedom — and that, of course, includes the courts — have the responsibility of seeing to it that each individual book or publication, whatever its contents, price, or method of distribution, is dealt with in accordance with due process of law. Adequate notice, judicial hearing, fair determination are the essence of " due process " and this is what the statute here has assured. I am of the considered opinion that when the court — after an adversary hearing — is able to read and examine the publications objected to, and acts judicially to enjoin their distribution, it is apparent that there is no " previous restraint " in the genuine historical and constitutional sense of that term (cf. the statutory plan described in *Attorney General* v. *The Book Named " Forever Amber ",* 323 Mass. 302, and *Attorney General* v. *The Book Named " God's Little Acre ",* 326 Mass. 281).

In the circumstances, the contention that there is here an unconstitutional prior restraint is invalid. *Near* v. *Minnesota* (283 U. S. 697, 702, *supra*), relied upon so heavily by the defendants, is not a holding to the contrary. The Minnesota statute provided that a person who possessed or circulated " (a) an obscene, lewd and lascivious newspaper, magazine, or other periodical, or (b) a malicious, scandalous and defamatory newspaper, magazine or other periodical " (Minn. Stats. 1927, § 10123-1) was guilty of a nuisance which could be enjoined. The question before the court did not involve the obscenity provision of the statute, but clause " b ", relating to an alleged " scandalous and defamatory newspaper " known as " The Saturday Press ". The Supreme Court of the United States included in its opinion several basic expressions which clearly differentiate its holding there from the one I am about to make in the case at bar. At pages 715–716, the court said: " The objection has also been made that the principle as to immunity from previous restraint is stated too broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases ". And then the court stated (p. 716) that one of these exceptions is that " the primary requirements of decency may be enforced against obscene publications " and that " [t]he security of the community life may be protected against incitements to acts of violence ". And in the more recent case of *Joseph Burstyn, Inc.*, v. *Wilson* (343 U. S. 495, which struck down, as repugnant to the First and Fourteenth Amendments, a licensing statute with respect to motion picture films), the court expressly reserved the question " whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films " (p. 506).

*Cantwell* v. *Connecticut* (310 U. S. 296, 306), is cited by the defendants as authority for the proposition that so-called censorship by the judiciary — even though action is based, as it is here, on due process and judicial determination — is just as impermissible as advance censorship by an administrative officer. That case deals with a statute forbidding solicitation for a religious cause without first obtaining a certificate from a designated official, who may withhold the permit if he determines that it is not a religious cause. The statute clearly imposes a prior restraint and was held void upon its face. The fact that provision is made (as is not unusual — see Civ. Prac. Act, art.

78) for a judicial review of the licensor's determination does not remove the permit feature from the sphere of a previous restraint. That is not this case. Section 22-a does not provide for a permit or a license; it does not require any application or fee. It does not suppress in advance what is to be published. The Legislature has simply determined that what has long been recognized as criminal (Penal Law, § 1141) the Supreme Court may enjoin and abate in a civil suit (Code Crim. Pro., § 22-a). Provision has been made at the very outset for judicial action in the sphere of recognized equity jurisdiction and jurisprudence. Injunctions and abatements — when decreed by the court after due notice and trial — are not a species of objectionable censorship but rather are judicial determinations of justiciable controversies.

I recognize, of course, that remedy by injunction against words is exceptional — and, in my view, should properly be reserved for those cases where the exigency is clear (see Pound, Equitable Relief against Defamation and Injuries to Personality, 29 Harv. L. Rev. 640, 666, and Chafee on Free Speech in the United States, pp. 9–10). But there have been and are such cases, and injunctions against certain obnoxious utterances are not without authoritative precedent. To mention one type of such injunction — thoroughly litigated during recent decades — I need but refer to cases involving labor disputes in which it has been held that it is within the recognized jurisdiction of a court of equity to restrain, under certain circumstances, the reiteration of false, misleading and fraudulent statements — notwithstanding the constitutional guarantees against infringement upon the rights of free speech and free press (see *Nann* v. *Raimist,* 255 N. Y. 307, 317; cf. Schlesinger, A Summary and Critique of the Law of Peaceful Picketing in New York, 22 Fordham L. Rev. 20, 41–47, and Burstein, Picketing and Speech, 4 Labor L. J. 791).

It may be that, in certain cases, it would be helpful to obtain the fair verdict of a jury of reasonable adults in the community as to whether any particular publication is or is not obscene within the meaning of the statute. No doubt a jury is generally better fitted than a court to determine whether some books are obscene. "Far better than we, is a jury drawn from those of varied experiences, engaged in various occupations, in close touch with the currents of public feeling, fitted to say whether the defendant had reasonable ground to believe that a book such as this was obscene or indecent." (*Halsey* v. *New York Soc. for Suppression of Vice,* 234 N. Y. 1, 6, *supra.*)

Upon application, in the case of a misdemeanor prosecution in the city of New York, the court may certify that it is reasonable that the charge be prosecuted by indictment — with the consequent effect that the trial be by jury (N. Y. City Crim. Cts. Act, § 31, subd. 1, par. [c]). But the Constitution of this State does not compel jury trials of misdemeanor charges (art. VI, § 18), and violation of section 1141 of the Penal Law is a misdemeanor. That a jury is not ordinarily a part of the judicial tribunal in equity cases is well known (*Jamaica Sav. Bank* v. *M. S. Investing Co.*, 274 N. Y. 215, 221). Yet, a jury trial of certain issues may be granted on the equity side of the court, or denied, in the exercise of the chancellor's discretion (Civ. Prac. Act, § 430). No application for a jury trial was made here — perhaps because there can be no doubt that " Nights of Horror " is unquestionably within the category of the obscene.

The corporation counsel has, however, gone beyond pleading for an injunction to restrain acquisition and distribution of what has been and is; he seeks to enjoin what he contends might be. He urges me to enjoin not only the " further sale " and " further distribution " — to use the precise language of the empowering statute (§ 22-a) — of the issues of the obnoxious publication in evidence, but also the sale and distribution of later issues as well. The statute does not, in express terms, compel such a determination. Only by implication and construction could it be said that the legislative prohibition was intended to cover not only a publication presently in existence, but one not yet in being and therefore not subject to judicial examination. I am of the view that to rule against a volume not offered in evidence would do just what the courts have held is constitutionally forbidden — that is, to impose an unreasonable prior restraint upon freedom of the press.

Our constitutional jurisprudence abounds with precedents denying unlawful previous restraints upon the cherished freedoms guaranteed by the Constitution. Prior restraints have been held invalid not only in *Near* v. *Minnesota* (283 U. S. 697, 713, *supra*), but this basic doctrine of constitutional law has been applied in every area of the First Amendment: speech, press, assembly, and religion [*Saia* v. *New York*, 334 U. S. 558 (permit for use of sound trucks); *Kunz* v. *New York*, 340 U. S. 290 (permit required to hold public worship meetings on street); *Lovell* v. *Griffin*, 303 U. S. 444 (permit required for distribution of pamphlets); *Cantwell* v. *Connecticut*, 310 U. S. 296 (permit

required for solicitation of moneys for religious causes); *Hague* v. *C. I. O.*, 307 U. S. 496 (previous restraint on speech and assembly); *Niemotko* v. *Maryland*, 340 U. S. 268 (permit for use of park for holding meeting); *Largent* v. *Texas*, 318 U. S. 418 (permit for soliciting orders for books or various household articles); *Jamison* v. *Texas*, 318 U. S. 413 (distribution of handbills); *Schneider* v. *State*, 308 U. S. 147 (distribution of pamphlets without permit); *Grosjean* v. *American Press Co.*, 297 U. S. 233, *supra* (tax on newspaper circulation); *Superior Films* v. *Department of Educ.*, 346 U. S. 587, *supra*, and *Joseph Burstyn, Inc.*, v. *Wilson*, 343 U. S. 495, *supra* (vague general standard in prelicensing of motion pictures)]. The Court of Chancery of New York spoke out on this subject as early as 1839 (*Brandreth* v. *Lance*, 8 Paige Ch. 24), but the most articulate pronouncement was not to be heard until Chief Justice HUGHES' opinion in 1931 in *Near* v. *Minnesota* (283 U. S. 697, *supra*). There, the United States Supreme Court declared invalid a State statute as a previous restraint upon the freedom of the press as guaranteed by the First and Fourteenth Amendments. Since the injunction in that case sought to suppress future issues of a periodical (found to have been defamatory in the past), it was held that the decree was too broad as an unreasonable restraint upon the press, and that either civil or criminal libel after publication would have afforded an adequate remedy.

Since there cannot possibly be an assurance that a future issue would necessarily be obscene, the requested advance suppression of what might be seems (at least to me) to be violative of the constitutional right of free press. Be that as it may, it is an established principle of our law that a statute must, if possible, be so construed as to be constitutional (*Crowell* v. *Benson*, 285 U. S. 22, 46; *Panama R. R. Co.* v. *Johnson*, 264 U. S. 375; *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407–408; *Kaufman & Sons Saddlery Co.* v. *Miller*, 298 N. Y. 38, 44), and even to avoid, if possible, raising substantial constitutional questions (see *Peters* v. *Hobby*, 349 U. S. 331, and *Kupferman* and *O'Brien*, Motion Picture Censorship — The Memphis Blues, 36 Cornell L. Q. 273, 278–280). Had the legislation now under attack offered the entire scope of relief sought by the plaintiff (i.e. the injunction against all future issues), it would, I sense, raise serious constitutional questions.

In consequence it follows that there can be no injunction regarding an unpublished book or pamphlet — however likely it may be thought that it will, when issued, be violative of the statute. Unless the work be before the court at the time of the

hearing at which the injunction is sought, it is inappropriate to make a judicial determination with respect to it. In respect of this feature of the case, the plaintiff seeks a likely trespass upon a constitutionally protected area, and the court must reject that prayer.

The defendants also contend (without argument or citation) that the judgment which I am about to render would amount to an unconstitutional seizure (U. S. Const., 4th Amendt.; N. Y. Const., art. I, § 12). I hold this claim to be wholly without merit. The prohibition against " unreasonable searches and seizures " does not, I take it, forbid judicially declared action based upon constitutionally authorized jurisdiction — and duly taken thereunder (cf. *Matter of Both,* 200 App. Div. 423) — but rather against certain action sans due judicial sanction. A court of equity, I have now held, may constitutionally be given power to enjoin the sale and distribution of existing obscene publications. I do not see wherein it may not also validly be given jurisdiction concomitant therewith to compel the surrender and destruction of such publications. The lawbooks are not without analogies, although I found no precise precedents one way or the other.

Replevin is an ancient legal remedy. The abatement of a nuisance has long been known in the field of equity jurisprudence. When a person is legally arrested, he may be searched to discover and seize the fruits of his crime (see *Weeks* v. *United States,* 232 U. S. 383, 392, and *People* v. *Chiagles,* 237 N. Y. 193, 195); so, too, it may be said that when a " res " is lawfully " arrested ", and permanently condemned, the Legislature may authorize its seizure and destruction. Constitutional immunity is granted not from all searches and seizures, but only from those which are " unreasonable " (U. S. Const., 4th Amendt.; N. Y. Const., art. I, § 12; Civil Rights Law, § 8; *People* v. *Richter,* 265 App. Div. 767, 771, affd. *People* v. *Richter's Jewelers,* 291 N. Y. 161). As Judge CARDOZO reasoned in another connection, " [T]he fact that the weapon was contraband, a nuisance subject to destruction  *  *  *  [m]ight have justified the seizure, the abatement of the nuisance, if the weapon had been exposed to view." (*People* v. *De Fore,* 242 N. Y. 13, 18, certiorari denied 270 U. S. 657.) Firearms and slot machines, for example, have, under certain circumstances, been declared " public nuisances " by the Legislature, and subject to seizure and destruction. As such, they may, after due notice and fair trial, be seized and abated without violating constitutional guarantees (Penal Law, §§ 982–985, 1899; *People* v. *Whitcomb,* 273 App. Div. 610, motion for leave to appeal to the Court of

Appeals denied, 274 App. Div. 851, appeal dismissed 298 N. Y. 635; *People* v. *De Fore, supra*). The Legislature has now also classified " obscene " matter as " contraband ", and determined that it may be seized and destroyed in pursuance of court decree after an open trial (Code Crim. Pro., § 22-a). I hold that the classification is justifiable, that the defendants have been fully and fairly heard, that there is due process of law, and that " seizure " is reasonable and not violative of the Constitution.

Specious, too, in my view, is the defendants' challenge directed to the plaintiff's capacity to sue. Section 22-a specifically provides (subd. 1) that " the corporation counsel  *  *  * of any city  *  *  * in which a person, firm or corporation sells or distributes or is about to sell or distribute or has in his possession with intent to sell or distribute or is about to acquire possession with intent to sell or distribute any  *  *  * [proscribed printed matter] may maintain an action for an injunction  *  *  * in the supreme court to prevent the sale or further sale or the distribution or further distribution or the acquisition or possession of " that matter.

The charter of the City of New York provides for the appointment of a corporation counsel by the Mayor (§ 391). Subdivision (a) of section 394 of the charter reads: " *Except as otherwise provided by law,* the corporation counsel shall be attorney and counsel for the city and every agency thereof and shall have charge and conduct of all the law business of the city and its agencies and *in which the city is interested.*" (Emphasis supplied.) In section 30 of the City Home Rule Law, the Legislature specifically reserved to itself the power " to pass laws regulating *matters of state concern* " (emphasis supplied); (see, also, N. Y. Const., art. IX).

I hold that section 22-a of the Code of Criminal Procedure is an instance in which " otherwise " was " provided by law ". In addition, what may be " matters of state concern " may also be something " in which the city is interested ". The publication and distribution of material devoted to obscenity, lewdness, lasciviousness, filth, indecency and disgust — to crime, sex, horror, terror, brutality, lust and depravity — have been found by the Legislature to be a contributing factor to juvenile delinquency, a basic factor in impairing the ethical and moral development of our future citizens, and a clear and present danger to the people of our State. As such, these are, it seems to me, " matters of state concern " " in which the city is [also] interested ".

Judgment is rendered in the plaintiff's *** favor on the merits to the extent herein indicated. The defendants *** will be permanently enjoined from distributing, selling or acquiring possession of any of the volumes of the publication entitled "Nights of Horror" received in evidence upon the trial, and they will be directed to surrender to the Sheriff of the City of New York (New York County Division) all copies of these volumes now in their possession, and the Sheriff will be directed to seize and destroy them. Settle judgment accordingly. (The parties having duly waived findings of fact and conclusions of law, this opinion will constitute the decision of the court in pursuance of the provisions of the Civil Practice Act.)

*** Since the institution of this action, Adrian P. Burke resigned as corporation counsel of the City of New York, and Peter Campbell Brown, thereafter duly appointed corporation counsel, is substituted as plaintiff in his stead.

On motion of the plaintiff the title of the action is also amended, with respect to certain of the defendants, as follows: (1) "Louis Finkelstein, doing business as Times Square Book Shop", instead of "Times Square Book Shop, Louis Finkelstein", and (2) "Philip Pellegrino, doing business as "Pelley Book Shop" instead of "Pelley Book Shop, Philip Pellegrino".

The defendants Metropolitan Book Shop Inc. and Philip Pellegrino did not appear, although served with process. The defendant Anne Goldberg was not served with process and is deceased. The defendants Publishers Outlet and Gordon Law were not served with process.